**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ANA ARMENGOL, an individual,

Plaintiff,

**JURY TRIAL DEMANDED**

v.

Case No.: 6:07-cv-01216-JA-DAB

HOME DEPOT U.S.A, INC., d/b/a THE HOME DEPOT, a foreign corporation, CHRISTINE M. UMTHUN, in her individual capacity and in her corporate capacity, MARK FOSTER, in his individual capacity and in his corporate capacity, and SALLY BUFFKIN, in her individual capacity and in her corporate capacity,

Defendants.
_________________________________/

## SECOND AMENDED COMPLAINT

**COMES NOW** Plaintiff Ana Armengol ("Armengol"), by and through her undersigned counsel, and hereby sues the Defendants Home Depot U.S.A., Inc., d/b/a The Home Depot, ("Home Depot"), a foreign corporation, Christine M. Umthun ("Umthun"), in her individual and corporate capacities; Mark Foster ("Foster"), in his individual and corporate capacities; and Sally Buffkin ("Buffkin"), in her individual and corporate capacities, and states as follows:

## INTRODUCTION

1. Ana Armengol brings this lawsuit after being subjected to illegal actions by Defendants including illegal employment actions under the Florida Civil Rights Act ("FCRA"), *Fla. Stat.* § 760 *et seq.*; the Florida Whistle-blower's Act ("FWA"), *Fla. Stat.* § 448.101 *et seq.*; and negligent violation of *Fla. Stat.* § 448.045 .

2. Armengol alleges that her former employer, Home Depot, has discriminated against her based upon her national origin, and retaliated against her based upon her complaints of illegal activity, including the discrimination. At least in part because of the discrimination and retaliation, Armengol was deprived of promotional opportunities, subjected to arbitrary, biased and unfair disciplinary and employment actions, subjected to a hostile work environment, prevented from being considered for transfers, and terminated via a constructive discharge, all of which materially affected the terms and conditions of her employment.

3. Damages are claimed to be in excess of $15,000, exclusive of attorneys' fees, interest and costs, and for equitable relief that the Court may deem appropriate including, but not limited to, any appropriate injunctive or declaratory relief.

**JURISDICTION, VENUE, AND PARTIES**

4. The Circuit Court of Florida has subject matter jurisdiction under Florida Statutes.

5. Venue is proper in the Circuit Court of the Ninth Judicial Circuit, in and for Osceola County, Florida, pursuant to *Fla. Stat.* § 47.011, because the unlawful practices were committed by the Defendants in this judicial circuit.

6. Plaintiff Armengol is an Hispanic female *sui juris* who at all times relevant herein was a resident of Osceola County, State of Florida.

7. At all times relevant herein, Armengol was employed by Home Depot, as that term is understood by the applicable laws. Home Depot is a foreign corporation registered to conduct business in the State of Florida, and is an entity that provides home improvement and building supplies to retail customers. As such, Home Depot is governed by local, regional, state and federal rules, regulations and laws.

8. At all times relevant herein, Home Depot operated and/or managed and maintained employees at their various facilities located in Osceola County, Florida, including, without limitation, Armengol, who worked at the Home Depot store located at 2601 W. Vine Street, Kissimmee, Osceola County, Florida.

9. At all times relevant herein, Umthun was a resident of the state of Florida and employed by Home Depot. From April 17, 2006 to present, Umthun acted as the Store Manager of the facility located at 2601 W. Vine Street, Kissimmee, Osceola County, Florida.

10. Umthun, in her capacity as Store Manager, had direct responsibility and control over the decisions to address, redress or ignore complaints and concerns of discrimination and/or retaliation raised by employees at the Kissimmee store; to create, maintain and/or perpetuate personnel decisions of employees at the Kissimmee store, all of which created or maintained a pattern or practice of discrimination and/or retaliation against employees at the Kissimmee store who complained of discrimination, as more fully described herein.

11. Umthun had direct involvement in, had knowledge of, and was directly informed by Plaintiff of adverse employment actions that had been taken against Armengol and other Hispanic employees because of their race and/or national origin, and Umthun intentionally and willfully participated in and sanctioned said practices by, *inter alia*, upholding such practices, approving of and directly engaging in such practices and failing to take any action to correct said adverse and discriminatory employment practices against Hispanic employees, and as described further herein.

12. Umthun, individually and in her capacity as Store Manager, was a direct contributor to Home Depot's practice of discriminatory employment practices, by *inter alia*, restricting and/or denying Hispanic employees promotions, emergency leave and other benefits of employment given to non-Hispanic employees, by subjecting Hispanic employees to harsher disciplinary action than

that of non-Hispanic employees, and by subjecting Hispanic employees to verbal abuse and humiliation because of their national origin, and as more fully described throughout this Complaint.

13. At all times relevant herein, Foster was a resident of the state of Florida and employed by Home Depot as a District Manager.

14. Foster, in his capacity as District Manager of the central Orlando District, had responsibility and control over the decisions to address, redress or ignore complaints and concerns of discrimination and/or retaliation raised by employees, including responsibility and control over the personnel decisions of the Store Manager and to approve or disapprove of store-level decisions.

15. Foster, in his capacity as District Manager, had responsibility and control over the decisions of Store Managers, including Umthun, and intentionally and willfully made decisions to create, maintain and/or perpetuate personnel decisions within his district, which created and/or maintained a pattern or practice of discrimination and/or retaliation against employees, including, but not limited to, termination, who complained of discrimination.

16. Foster had knowledge of Home Depot's adverse employment actions and discriminatory practices toward Armengol and other Hispanics, based on national origin (via Alert Line reports and through direct reports by Armengol). Foster intentionally and willfully participated in and sanctioned said practices by, *inter alia*, upholding such practices, approving of and directly engaging in such practices, directing others, including, but not limited to Umthun, to carry out such actions and practices, and failing to take any action to correct said adverse and discriminatory employment practices, as described more fully herein.

17. Foster, in his individual capacity and as District Manager, was a direct contributor to Home Depot's practice of discriminatory and retaliatory employment practices, by *inter alia*, denying Armengol and other Hispanic employees access to appropriate promotion and transfer opportunities provided to other non-Hispanic employees, by directly recommending, implementing and ordering others to engage in retaliatory actions and treatment against Armengol and other Hispanic employees because of their national origin, as described more fully herein.

18. Foster participated in the above-referenced actions knowing they would cause a Constitutional deprivation to Armengol and other Hispanic employees.

19. Buffkin, in her capacity as Regional Human Resources Manager, had responsibility and control over the decisions to address, redress or ignore complaints and concerns of discrimination and/or retaliation raised by employees, including responsibility and control over the personnel decisions of Store Managers and Human Resource Managers in her region.

20. Buffkin, in her capacity as Regional Human Resources Manager, had responsibility and control over the decisions of Store Managers and Human Resource Managers, including Umthun, and intentionally and willfully made decisions to create, maintain and/or perpetuate personnel decisions that created or maintained a pattern or practice of discrimination and/or retaliation against employees, including, but not limited to, termination, who complained of discrimination.

21. Buffkin had knowledge of Home Depot's adverse employment actions and discriminatory practices toward Armengol and other Hispanics, based on national origin (via Alert Line reports and through direct reports by Armengol). Buffkin intentionally and willfully participated in and sanctioned said practices by, *inter alia*, upholding such practices, approving of and directly engaging in such practices, directing others, including, but not limited to Umthun, to

carry out such actions and practices, and failing to take any action to correct said adverse and discriminatory employment practices, as described more fully herein.

22. Buffkin, in her capacity as Regional Human Resources Manager, was a direct contributor to The Home Depot's practice of discriminatory and retaliatory employment practices, by *inter alia*, denying Armengol and other Hispanic employees access to appropriate promotion and transfer opportunities provided to other non-Hispanic employees, by recommending, implementing and ordering others to engage in retaliatory actions and treatment against Armengol and other Hispanic employees because of their national origin, and as described more fully herein.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

23. Armengol timely dually filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

24. Armengol filed this lawsuit within ninety (90) days of her receipt of a Dismissal and Notice of Rights issued by the EEOC and more than one hundred eighty (180) days after her Charge of Discrimination was filed with the FCHR.

25. All conditions precedent to the filing of this lawsuit have been met or otherwise waived.

26. Plaintiff has exhausted all administrative remedies available to her prior to filing this lawsuit.

## FACTUAL ALLEGATIONS

27. Ana Armengol began her career with Home Depot in 1992, and over the past 14 years, has been an exemplary employee who has, at almost every opportunity, received praise, raises and promotions. She has willingly moved within Home Depot from New York to Puerto Rico and

to Florida to assist at various locations and to be able to put her well-proven knowledge of store operations and skills to use. As of October 2005, she was promoted all the way to Operations Assistant Manager, and was assured that she would become a Store Manager. Her performance evaluation in January 2006 indicated she was immediately ready and qualified to fill such a position. (See Exhibit A of the original Complaint [Dkt. 1-1])

28. Since beginning with Home Depot as a cashier, she has since strived to excel in all aspects that her various positions entailed, and has succeded. Armengol has a diversified background and is knowledgeable in numerous areas of store operations, including, but not limited to, cashier, paint department, plumbing department and management.

29. Armengol was always a top performer in her field, who had, prior to April 17, 2006, consistently received outstanding performance evaluations, recommendations by peers and supervisors, commendations by customers and corporate representatives and has generally and specifically excelled in every job she has performed for Home Depot. Armengol's impressive resume indicates she is qualified to handle many areas of the store and clearly outlines her goals for advancement.

30. On February 2, 2004, Armengol applied for and was awarded the position of Operations Assistant Manager at the Kissimmee store, which was the second highest position within the store. The Store Manager at the time, to whom she directly reported, was Samuel "Chris" Moulton ("Moulton").

31. At some time between October and December of 2005, Armengol privately informed District Manager Mark Foster ("Foster") of her perception that Moulton showed favoritism toward Caucasian employees over non-Caucasian employees, by, among other things, having all Caucasian department heads in a store where the staff was 20% Caucasian, by ignoring

Hispanic and African American employees and by making negative comments toward Hispanic and African American employees regarding their intelligence levels. Armengol believed her conversation with Foster would remain anonymous.

32. However, later that same day, Moulton phoned and questioned Armengol as to why she would provide such information to Foster. During her conversation with Moulton, the tone became very uncomfortable, and she started feeling some reprisal from having made a report of race discrimination.

33. In January 2006, Armengol received a glowing performance evaluation. Her evaluation indicated she was ready for an immediate promotion to Store Manager. (See Exhibit A of the original Complaint [Dkt. 1-1])

34. At the end of March 2006, Armengol attended an RMA interview process.[1] After completion of the RMA, she was told by Ben Bauer ("Bauer"), the Store Human Resources Manager through approximately April 2006, as well as by Moulton, that she was being trained/groomed to become the Store Manager of the Poinciana store. In addition, both Foster and Moulton began providing store manager training materials and preparatory work to ready her for that position.

35. In April 2006, Moulton took a medical leave of absence. The first day Moulton was gone, Plaintiff was questioned by Foster and Buffkin regarding possible discriminatory, unethical and/or illegal practices Moulton allegedly performed (i.e. failure to report Workers' Compensation claims on three Hispanics and issues involving unauthorized markdowns). Plaintiff confirmed to Foster and Buffkin that the allegations were, indeed, true, at which time Foster and Buffkin indicated they felt Armengol was holding back information and that she should have reported those

[1]The RMA interview process is used by Home Depot to determine each employee's ability and readiness to move to a higher position within the management framework. This is an 8-hour process consisting of extensive testing followed by a one-hour interview.

activities to them. Armengol felt that she had done what she could by going to Foster in the first place, but that Foster never did anything to follow up.

36. Soon, it became known that Moulton's departure was permanent and at that point, Armengol, as well as other associates and assistant managers, believed Armengol would become the Store Manager.

37. However, on April 13, 2006, Christine Umthun was announced as the new temporary Store Manager at a meeting for managers and supervisors held by Mark Foster. Umthun officially started work on April 17, 2006.

38. Armengol had absolutely no hard feelings, particularly because it was still widely believed and talked about that she was to still take over as Store Manager at the Poinciana store.

39. During the first week of Umthun's employment at the Kissimmee store, Armengol began getting complaints from non-Caucasian employees alleging Umthun was showing favoritism toward Caucasian employees.

40. Armengol approached Umthun to let her know she had received complaints from non-Caucasian employees, reporting they felt Umthun treated non-Caucasian employees differently (negatively) than their Caucasian counterparts. However, Umthun ignored her advice and the discriminatory behaviors continued.

41. On or about April 27, 2006, Umthun singled out Armengol in a meeting of Assistant Managers, stating that she had observed Armengol during her first week as Store Manager and had determined that Armengol was unable to complete her work as a result of being "too close to the Hispanic employees." In front of everyone, Armengol was instructed by Umthun to distance herself from Hispanic employees. This was not only obviously a shock, as any criticism of her work performance had ever previously been mentioned, but it was also a stunning glimpse of Umthun's

view of race relations in the store.

42. Shortly after this meeting, Armengol started becoming more and more aware of a hostile attitude she and other Hispanic employees were facing within the store under Umthun's management. She continued to get complaints from non-Caucasian employees of being ignored, harassed and yelled at by Umthun. Other Caucasian Assistant Managers also witnessed and noted Umthun's behavior and attitude toward non-Caucasian employees.

43. Shortly after the comment accusing Armengol of doing a bad job because she was "too close to Hispanic employees," Armengol started getting questions from Umthun and Foster about a letter that she was told had been sent to her by Ben Bauer (an Asian Store Human Resources Manager who was terminated on March 16 and replaced by a white female named Laurie Sullivan).

44. Armengol was accused of having some sort of improper contact with Bauer. Apparently, Bauer had sent her a letter at the store, and somehow Foster ended up with the letter, although Armengol never did, and still never has, seen it.

45. In response to constant comments about this mysterious letter, Armengol continually told Foster and Umthun that she had no idea what they were talking about. At one point, Foster told her that the letter contained information about Moulton and supposed "discriminatory practices." Armengol still insisted truthfully that she had no idea what was in the letter or why it was sent to her.

46. The constant harassment about Bauer and Moulton made Armengol even more uncomfortable given the facts that she continually told them she did not know anything and that she had previously talked to Foster about Moulton and the prejudicial attitude and behaviors at the store. Armengol started to realize that no matter how truthful and how much information she gave

to them, they were simply not going to ease up.

47. In early June, amidst the constant harassment, Armengol encountered a family emergency. On June 6, 2006, Plaintiff phoned Umthun and requested emergency leave up to two weeks for the placement of her three grandchildren in her home by the Department of Children and Families. The year prior, Home Depot had provided her paid leave for the same situation. In addition, Home Depot had previously (2005) provided Armengol with three weeks paid leave to assist her father, who had been diagnosed with cancer. Both of these requests had been granted by Moulton, with Foster's approval, and without any problems as her status as manager entitled her to unlimited paid personal and sick time.

48. However, instead of granting her time off, in response to Armengol's request, Umthun became verbally abusive to Armengol and denied her requested leav, citing the important inventory preparation work going on during June and July, and stating, "When are you people going to get it through your heads that we're in inventory."

49. Armengol, upset, subsequently phoned Foster and related the situation, requesting a leave of absence in order to find a care provider to watch her grandchildren while she worked and to potentially address initial DCF placement issues, which she assured him would be no longer than two weeks and could potentially be as short as two days. Foster stated he would contact Buffkin and get back to her. Foster never got back to Armengol about the request.

50. Having no choice and despite her requested leave, arrived at work on July 7 to be told by the co-Manager, Rick Shilling ("Shilling") that she had actually been approved for a leave.

51. Armengol immediately phoned Sullivan, the new Human Resources Manager, and confirmed the leave had in fact been approved. Sullivan regretfully informed her, however, that she would have to take the leave unpaid, as directed by Foster and Buffkin, despite having been

provided company-paid leave the year prior in the exact same situation (before having made any complaints of employment discrimination). Further, other managers were still allowed to take vacation and personal days with pay during the same time period.

52. Despite the grant of leave and/or personal time provided to other similarly situated, non-Hispanic employees and employees that had not previously complained of discrimination, Armengol was not offered the same opportunity and therefore was forced to turn down the offered leave due to its unpaid status.

53. Armengol continued to receive associate complaints of discrimination and her relationship with Umthun continued to decline.

54. On June 7, 2006, Armengol informed Home Depot she could not work the nights prior to June 29, 2006 and July 7, 2006, as she was scheduled to appear at early morning court hearings related to the placement of her grandchildren. She provided Rick Schilling written copies of the dates she needed off. This notice was more than sufficient pursuant to company policy and practice.

55. On June 8, 2006, Armengol also personally informed Umthun of her scheduling needs and observed Umthun record those dates in Umthun's personal calendar.

56. However, when the schedule was posted for those weeks, despite her request, Umthun scheduled Armengol to work both June 29, 2006 and July 7, 2006 on the inventory shift (8:00 p.m. to 5:00 a.m. or 9:00 p.m. to 6:00 a.m.).

57. During the week of June 19-25, 2006, Umthun changed Armengol's schedule to days, with Thursday and Friday (June 22 and 23) as her days off.

58. Umthun scheduled an inventory walk-through for the evening of June 22, 2006 with Loss Prevention Manager, Fred Wentworth. On June 21, 2006, Umthun asked Armengol to

participate, despite it being her day off. Armengol informed Umthun that she was unsure she would be able to attend due to obligations to DCF, but would do her best to participate in the walk-through. However, Armengol was unable to attend the walk-through due to a DCF visit regarding her grandchildren.

59. Fred Wentworth did not attend the walk-through for reasons unknown to Armengol.

60. On the evening of June 22, 2006, Umthun attempted to phone Armengol, but Armengol could not answer due to the presence of DCF investigators.

61. On the morning of June 23, 2006, Umthun informed Armengol she was giving her a disciplinary action for not showing up to the inventory walk-through. Umthun was angry and yelling. Her behavior was witnessed by other employees.

62. Fred Wentworth was never issued disciplinary action for his failure to attend the same walk-through.

63. Knowing Umthun's schedule changes and the denial of her requested days off were just another form of harassment, Armengol went to work on the evening of June 28, 2006, at her scheduled time of 8:00 p.m. She did not want to give Umthun or Home Depot a reason to discipline her for having to attend the court hearing scheduled for 8:30 a.m. on June 29, 2006. Prior to her arrival at the store that night, Armengol had gotten little sleep due to the need to prepare for the hearing the next day.

64. At approximately 1:00 a.m. during that shift, Armengol had a near-miss accident on top of an 8-foot ladder. Recognizing her inability to safely perform her job duties, Armengol approached the other Assistant Manager, Tom Burgoon, and informed him she was unable to complete her shift due to safety concerns, since there was another assistant manager there to cover her shift.

65. On the morning of June 29, 2006, Umthun phoned Armengol while on the way to the court hearing and began yelling at and harassing Armengol, apparently in front of other employees, for having left her shift early. Armengol explained what happened, but had to get to her Court hearing and asked to be able to finish the discussion later.

66. Later that same day, Armengol went to work early at 5:00 p.m. to finish her discussion with Umthun, only to find out Umthun had left her shift over an hour early that day.

67. Armengol proceeded to phone Umthun to finish the discussion, but there was only a repeat performance of the morning conversation where Umthun began to yell at and denigrate Armengol, threatening disciplinary action.

68. The following day, Umthun documented disciplinary action against Armengol for leaving her shift early. (See Exhibit B of the original Complaint [Dkt. 1-1]) This discipline was clearly unwarranted given the fact that Armengol only left due to safety concerns, and due to the fact that other similarly situated non-Hispanic employees were not disciplined when they missed portions of their shifts, often with no excuse or reason whatsoever.

69. After this incident, Armengol started realizing just how intense the discriminatory treatment was becoming under Umthun, and recognizing that when she would stand up and say something, it would only continue to get worse. Nonetheless, she could not stand by and watch and experience the degrading behavior.

70. On July 10, 2006, because it received complaints turned in via the Alert Line (an anonymous telephone line set up for employees to feel safe in reporting employment issues), Home Depot conducted an investigation of alleged discriminatory conduct by Umthun. Sullivan, as the Human Resources representative for the store, performed the initial investigation.

71. As part of the initial investigation, Sullivan spoke with Armengol, an Hispanic male employee, Jonathan Roa, James Brown, two other Caucasian Assistant Managers and an African-American female employee regarding Umthun's treatment of minority employees. Armengol, along with other of the interviewed employees, including one of the Caucasian Assistant Managers, reported they believed Umthun discriminated against non-Caucasian employees, specifically citing instances when they had witnessed Umthun speak to Hispanic employees in a demeaning manor.

72. Pursuant to the findings of her investigation, Sullivan determined the incident was a significant situation requiring immediate attention and intervention and she requested another HR investigator, Marcia Mott ("Mott"), perform an independent investigation.

73. On July 13, 2006, Mott re-interviewed Armengol, Jonathan Roa and Julia Madramootoo, all of whom confirmed a general atmosphere of hostility and discrimination promoted and maintained by Umthun.

74. On July 13 and July 14, 2006, an e-mail exchange took place between Foster, Buffkin, Sullivan and Mott pursuant to the results of Mott's investigation and recommendation for further action. (See Exhibit C of the original Complaint [Dkt. 1-1])

75. In the e-mail exchange, instead of taking the situation seriously, Foster and Buffkin referred to Armengol as "be[ing] a real pain soon" and referenced Foster and Buffkin wanting to transfer Armengol out of the store because she had reported and objected to discriminatory practices against herself and other Hispanic employees.

76. The e-mail also referenced recommending retaliatory action against another employee participating in the investigation, Julia Madramootoo, an employee of Indian descent.

77. At or about the same time, an African-American female Assistant Operations Manager was brought in from another store to train with Armengol, without explanation and without an opening at the Kissimmee store for that position.

78. This time frame coincided with the end of inventory, which was a major factor and consideration in evaluating store performance by the Home Depot corporate office. The Kissimmee store received the best score they had ever received. As it turned out, it was also the best score in Foster's district.

79. After inventory was complete, Armengol expected to return to her old schedule of closing the store and having Thursdays and Fridays off, which accommodated the personal needs of Armengol and the other Assistant Managers, who preferred to open the store up so they could spend more time with their families. However, with no warning, discussion or explanation whatsoever, Armengol's schedule was changed by Unthum as to both the shift she worked and her days off.

80. Also, around the same time (between July 13, 2006 and July 19, 2006), Armengol received her scores pursuant to another RMA interview process in which she had been asked to participate. Unlike the glowing results she had received just three months prior, Armengol was determined to be deficient in almost all categories. (See Exhibit D of the original Complaint [Dkt. 1-1].) In contrast to normal company procedure[2], Unthum did not provide her a game plan for improvement to obtain a higher position or any opportunity to discuss the reasons for the results.

---

[2]Normal procedure required that the scores from the RMA process be given to the employee by the direct supervisor, accompanied by a game plan for improvement, with the employee having an opportunity to discuss the results and game plan with his/her supervisor.

81. Due to the ongoing discrimination and unfair treatment, and knowing that voicing her concerns in the past had only made things worse, on July 17, 2006, Armengol e-mailed another District Manager, Chris Cook ("Cook"), a white male, requesting a transfer into any openings in the either the Winter Haven or Lake Whales stores. (See Exhibit E of the original Complaint [Dkt. 1-1].) That same day, Cook called Armengol on her cell phone and reported there were no open positions at either of those stores.

82. On July 19, 2006 Foster told Armengol he had spoken to Cook, informed him that Armengol had "personal issues," and that Cook had no opening in either of those stores, even though Ana offered to take a demotion in order to transfer, as she had done several times in her career with Home Depot.

83. Foster then gave her the option of transferring to the St. Cloud store, which was further away from Armengol's residence, and which was well-known for having a reputation for quickly getting rid of minority employees who transferred into that store, and gave Armengol less than 24-hours to make a decision. At that point, Armengol knew she was being set up for termination.

84. On July 20, 2006, Armengol, as a result of the ongoing stress over the discriminatory and hostile work environment, and now the impossible situation she had been put in by Foster and Home Depot, went to her personal physician for help. The anxiety and stress from being subjected to Home Depot and Umthun's discrimination and retaliation was finally manifesting physically. Armengol's doctor diagnosed her with a migraine and depression and prescribed medication.

85. Immediately after her doctor's appointment, Armengol went to work. After her arrival, Armengol was asked to assist Sullivan by translating an Hispanic employee's concerns. As she translated the employee's concerns for Sullivan, Armengol began having left arm and chest pain. Sullivan ordered Armengol to go to the hospital immediately.

86. At the Emergency Room, Armengol was treated for stress due to the harassment and was told not to return to work until released by a physician.

87. Armengol applied for and was awarded a leave of absence under the Family Medical Leave Act.

88. However, it wasn't enough that Umthun and Home Depot's treatment caused severe stress. Despite being on federally protected leave, Umthun ordered Sullivan to get rid of Armengol. Umthun provided no legitimate reason for the order and, knowing the action was discriminatory and/or retaliatory, Sullivan refused.

89. Due to the ongoing, pervasive atmosphere of discrimination and retaliation, and Home Depot's refusal to correct the situation, Sullivan resigned on August 3, 2006.

90. While out on leave, Sullivan informed Armengol her job was in jeopardy. Armengol realized her situation was hopeless and that she could no longer tolerate the atmosphere of discrimination, hostility and retaliation, as it was finally affecting not only her mental and emotional well-being, but her physical health was now being threatened.

91. On August 28, 2006, due to the discrimination, retaliation and the resultant health problems, Armengol was forced from her fourteen-year career with a company to whom she had dedicated a good portion of her life, by Home Depot.

92. On or about the beginning of September 2006, a meeting of the supervisors and managers was held by Foster. At the meeting, Foster threatened termination to any employee who spoke with Armengol, Sullivan, Moulton or Bauer. Foster gave no reason for his threats.

93. As a direct, natural, proximate and foreseeable result of the actions of the Defendants, Armengol has suffered past and future pecuniary losses, physical and emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, humiliation, and other non-pecuniary losses and intangible injuries.

**COUNT I**

**VIOLATION OF CHAPTER 760, FLORIDA STATUTES:**
**<u>DISCRIMINATION BASED ON NATIONAL ORIGIN</u>**

94. This is an action for unlawful employment discrimination pursuant to Chapter 760, Florida Statutes, the Florida Civil Rights Act of 1992, against Defendant Home Depot by Armengol.

95. Armengol realleges and reasserts each and every allegation set forth in paragraphs 1 through 92 above, as though fully set forth herein.

96. Armengol, an Hispanic female, was a member of a protected class as that term is defined under the Florida Civil Rights Act (FCRA), *Fla. Stat.* § 760 *et seq.*

97. At all times relevant herein, Armengol has been qualified for and has performed her job satisfactorily.

98. As more thoroughly described above, Armengol was denied employment, transfer and promotional opportunities granted to similarly situated employees who were not Hispanic, because of her national origin. Armengol was also subjected to harsher disciplinary action and demeaning and humiliating treatment than similarly situated employees who were not Hispanic, because of her national origin.

99. Armengol's national origin was at least a motivating factor in Home Depot's decisions to deny Armengol fair and equal performance evaluations, prevent her from being considered for promotions and appropriate transfers, deny her promotional activities and allowing other hostile and racially-based adverse employment actions, including, but not limited to, constructive discharge.

100. As a direct, natural, proximate and foreseeable result of Home Depot's actions, Armengol has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, humiliation, mental anguish, loss of enjoyment of life, loss of dignity, and other non-pecuniary losses and intangible injuries.

101. The conduct of Defendant Home Depot was grossly intentional, reckless, willful, wanton, malicious, oppressive, and/or unmindful of obligations to Armengol and/or exhibited that entire want of care which would give rise to the presumption of conscious indifference to the consequences so as to warrant the imposition of punitive damages in an amount sufficient to punish, penalize or deter Home Depot for which they are liable to Armengol.

WHEREFORE, Plaintiff prays this Honorable Court enter an Order granting the following relief:

(1) an injunction ordering Defendant Home Depot to cease the continued violations of Federal law and Florida law;

(2) back pay, front pay, lost wages and benefits, with interest, to which Plaintiff was entitled to, had she not been subjected to the adverse employment actions complained of herein;

(3) compensatory damages allowable at law including, but not limited to, embarrassment and/or emotional distress;

(4) punitive damages for Defendant Home Depot's willful violations of Florida Civil Rights Act ("FCRA"), Chapter 760, Florida Statutes;

(5) prejudgment interest on her damages award;

(6) attorneys' fees, costs and expenses incurred by Plaintiff in filing this action;

(7) a declaration that Plaintiff was subjected to unlawful employment actions and ordering removal of any and all retaliatory disciplinary matters from her personnel file; and

(8) such other and further relief as this Court deems just and proper.

**COUNT II**

**VIOLATION OF CHAPTER 760, FLORIDA STATUTES:**
**<u>RETALIATION</u>**

102. This is an action for retaliation pursuant to Chapter 760, Florida Statutes, the Florida Civil Rights Act of 1992, against Defendant Home Depot by Armengol.

103. Armengol realleges and reasserts each and every allegation set forth in paragraphs 1 through 92 above, as though fully set forth herein.

104. Defendant Home Depot took adverse employment actions against Armengol because she engaged in protected activity, as that term is understood under the FCRA. Specifically, Defendant retaliated against Armengol because of Armengol' s allegations and complaints of a practice of harassment and discrimination based on national origin by Home Depot and, specifically, as applied to herself.

105. As more fully described above, on several occasions throughout her tenure with Home Depot, Armengol complained of illegal and unfair disciplinary practices and unfair and demeaning treatment, a protected activity under the FCRA.

106. After engaging in a protected activity under the FCRA, Armengol was subjected to adverse employment actions including, but not limited to, failure to consider her for and/or promote her to a higher paying management positions, for which she was qualified, unjustified disciplinary action and constructive discharge.

107. Armengol's protected activity was at least a motivating factor for the subsequent adverse employment actions described herein.

108. As a direct, natural, proximate and foreseeable result of actions of Defendant Home Depot, Armengol has suffered past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, and other non-pecuniary losses and intangible injuries.

109. The conduct of Defendant Home Depot was grossly intentional, reckless, willful, wanton, malicious, oppressive and/or unmindful of obligations to Armengol and/or exhibited that entire want of care which would give rise to the presumption of conscious indifference to the consequences so as to warrant the imposition of punitive damages in an amount sufficient to punish, penalize, or deter the Defendant Home Depot, for which Home Depot is liable to Armengol.

WHEREFORE, Plaintiff prays this Honorable Court enter an Order granting the following relief:

(1) an injunction ordering Defendant Home Depot to cease the continued violations of Federal law and Florida law;

(2) back pay, front pay, lost wages and benefits, with interest, to which Plaintiff was entitled to, had she not been subjected to the adverse employment actions complained of herein;

(3) compensatory damages allowable at law including, but not limited to,

embarrassment and/or emotional distress;

(4) punitive damages for Defendant Home Depot willful violations of Florida Civil Rights Act ("FCRA"), Chapter 760, Florida Statutes;

(5) prejudgment interest on her damages award;

(6) attorneys' fees, costs and expenses incurred by Plaintiff in filing this action;

(7) a declaration that Plaintiff was subjected to unlawful employment actions and ordering removal of any and all retaliatory disciplinary matters from her personnel file; and

(8) such other and further relief as this Court deems just and proper.

## COUNT III

## VIOLATION OF *FLA. STAT.* § 448.102 *et seq.*
## FLORIDA WHISTLE-BLOWER'S ACT

110. This is an action based on retaliation in violation of *Fla. Stat.*, § 448.102 *et seq*., the Florida Whistle-Blower's Act.

111. Armengol alleges and reasserts each and every allegation set forth in paragraphs 1 through 92 above, as if fully set forth herein.

112. As described above, Armengol objected to the discriminatory employment practices of Home Depot that were in violation of a law, rule or regulation.

113. As described above, on several occasions throughout her tenure with Home Depot, Armengol told management personnel of Home Depot that she felt she, along with other Hispanic employees, was being treated unfairly because of her national origin, and that she was being retaliated against for former similar complaints.

114. After objecting to the illegal discriminatory practices, Armengol was subjected to adverse employment actions, including denial of transfer and promotional opportunities, harsher disciplinary action and demeaning and humiliating treatment, and constructive discharge.

115. Armengol's protected activity was at least a motivating factor for the subsequent adverse employment actions, as described herein.

116. Due to the retaliation she has endured, Armengol has been forced to retain the services of the undersigned attorneys and is obligated to pay reasonable attorneys' fees and costs incurred in the prosecution of this cause.

WHEREFORE, Plaintiff prays this Honorable Court enter an Order granting the following relief:

(1) an injunction ordering Defendant Home Depot to cease the continued violations of Federal law and Florida law;

(2) back pay, front pay, lost wages and benefits, with interest, to which Plaintiff was entitled to, had she not been subjected to the adverse employment actions complained of herein;

(3) compensatory damages allowable at law including, but not limited to, embarrassment and/or emotional distress;

(4) prejudgment interest on her damages award;

(5) attorneys' fees, costs and expenses incurred by Plaintiff in filing this action;

(6) a declaration that Plaintiff was subjected to unlawful employment actions and ordering removal of any and all retaliatory disciplinary matters from her personnel file; and

(4) such other and further relief as this Court deems just and proper.

**COUNT IV**

**VIOLATION OF FLORIDA STATUTE § 488.045:**
**NEGLIGENT CONSPIRACY TO TERMINATE AGAINST DEFENDANTS**
**CHRISTINE M. UMTHUN, MARK FOSTER, and SALLY BUFFKIN**

117. This is an action against Defendants Christine M. Umthun, Mark Foster and Sally Buffkin for wrongful combination against workers pursuant to Florida Statute § 488.045, Negligent Conspiracy to Terminate.

118. Plaintiff realleges and reasserts each and every allegation as set forth in Paragraphs 1 through 92 above, as though fully set forth herein.

119. Fla. Stat. § 488.045 provides in part that, "If two or more persons shall agree, conspire, combine or confederate together...to cause the discharge of any person from work...such persons so combining shall be deemed guilty of a misdemeanor of the first degree...."

120. A cause of action in negligence per se is created when a penal statute is designed to protect a class of persons against a particular type of harm.

121. A duty is created in Fla. Stat. § 488.045 not to agree, conspire, combine or confederate together to cause the discharge of anyone from their work.

122. Plaintiff is a member of the class of persons intended to be protected by Fla. Stat. § 488.045.

123. The Individual Defendants have violated the duty imposed by Fla. Stat. § 488.045, and engaged in the type or harm set out in said statute, by agreeing, conspiring, combining and/or confederating together to cause the discharge of Plaintiff from her work.

124. The Individual Defendants' violation of Fla. Stat. § 488.045 was the proximate cause of Plaintiff's job termination.

125. The Individual Defendants are strictly liable for their acts of agreeing, conspiring,

combining and/or confederating together to cause the discharge of Plaintiff from her work.

126. The Individual Defendants acted against the best interest of Armengol in agreeing, conspiring, combining or confederating together to cause the discharge of Plaintiff from her work.

127. As a direct, natural, proximate and foreseeable result of the actions of the Individual Defendants, Armengol has suffered past and future pecuniary losses, emotional pain and suffering, inconvenience, humiliation, mental anguish, loss of enjoyment of life, loss of dignity, and other non-pecuniary losses and intangible injuries.

128. Plaintiff has had to retain an attorney to represent her rights in this action.

WHEREFORE, Plaintiff prays this Honorable Court enter an Order granting the following relief:

(1) back pay, front pay, lost wages and benefits, with interest, to which Wilson was entitled, had he not been subjected to the adverse employment actions complained of herein;

(2) compensatory damages allowable at law including, but not limited to, embarrassment and/or emotional distress;

(3) prejudgment interest on his damages award;

(4) attorneys' fees, costs and expenses incurred by Wilson in filing this action;

(5) a declaration that Wilson was wrongfully discharged and ordering removal of all disciplinary matters from his personnel file; and

(6) such other relief as this Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff, Ana Armengol, hereby demands trial by jury on all issues so triable.

Dated this 14th day of September, 2007.

Respectfully submitted,

__________________________

BERNARD H. DEMPSEY, JR.
Florida Bar No. 107697
NANCY A. JOHNSON
Florida Bar No. 0597562
DEMPSEY & ASSOCIATES. P.A.
1560 Orange Avenue, Suite 200
Winter Park, Florida 32789
Telephone: (407) 422-5166
Facsimile: (407) 422-8556
Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 14th day of September, 2007, a true and correct copy of the foregoing was sent to the following attorney of record via electronic mail using the CM/ECF case filing system:

Dinita L. James, Esq.
Desiree Demonbreun, Esq.
Tammie Rattray, Esq.
Ford & Harrison
101 E. Kennedy Blvd., Ste. 900
Tampa, FL 33602

/s/ Nancy A. Johnson
Attorney for Plaintiff